UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CRIMINAL ACTION NO. |
| | ) | 19-10030-DPW |
| v. | ) | |
| | ) | |
| ARNULFO REYES REYES, | ) | |
| and CYNTHIA ALVAREZ MANZANILLA, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER
July 29, 2020

Defendants, Arnulfo Reyes Reyes and Cynthia Alvarez Manzanilla are residents of Arizona charged with two counts of violation of federal criminal law in connection with alleged cross-country transport of fentanyl for purposes of distribution.  The pending motions to suppress before me concern two different occasions during which either Defendants themselves and/or Mr. Reyes Reyes's car were stopped by law enforcement agents while they were on cross-country journeys.

In February 2018, Defendants themselves were stopped by a deputy sheriff while driving a rental car in Phelps County, Missouri.  They were interviewed during the stop and agreed to follow the officer to the Sheriff's Department for a further search of Mr. Reyes Reyes's rental vehicle.  There, $45,600 was found in the rental car by law enforcement agents, and Dfendants made statements that implicated themselves in related criminal

activity.

The next month, Defendants put Mr. Reyes Reyes's car on a car carrier to be driven across the country to Massachusetts, where they would pick it up.  The car carrier was stopped en route, in Carson County, Texas, and the carrier driver consented to a further search of the car.  Fentanyl wrapped in cellophane was discovered in the car by law enforcement agents.

Defendants contend that law enforcement officials violated the Fourth and Fifth Amendments in the various  searches, seizures, and inquiries of Defendants in Missouri and Texas. After review of the totality of the circumstances, as disclosed by the evidence of record, I find that law enforcement officers acted reasonably, that the stops and seizures of the vehicles were justified at their inception by no less than reasonable suspicion of motor vehicle violations, that the ensuing investigations were justifiably expanded to include searches of the vehicles and their contents, and that the inquiries of Defendants generating inculpatory responses were not unconstitutional.  Accordingly, I will deny Defendants' motions to suppress the evidence developed by law enforcement agents as a result of the vehicle stops.

## I
## BACKGROUND

When a court makes a determination regarding a motion to

suppress, "[a] hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." *United States* v. *Jimenez*, 419 F.3d 34, 42 (1st Cir. 2005) (quoting *United States* v. *Staula*, 80 F.3d 596, 603 (1st Cir. 1996)).

Nothing in the submissions of record suggests any dispute about the material facts[1] on which I will make a determination regarding the pending motions to suppress.  Especially given the unique challenges posed by COVID-19 and the public health concerns associated with an in-court evidentiary hearing, it is prudent and in the interest of justice to avoid the delay that would be entailed by conducting an otherwise unnecessary, if virtual, evidentiary hearing when conduct of such a hearing is not called for.  Accordingly, I make my determinations based on the papers before me and the arguments of counsel at a non-evidentiary hearing.

---

[1] Defendants rely upon a collection of media materials focused on the incentives for law enforcement personnel in Missouri to take aggressive action in scrutinizing interstate travelers for traffic violations.  The short and sufficient answer to this evidence regarding the motives of law enforcement personnel is that it is immaterial because the governing test for probable cause analysis turns on objective circumstances and not subjective intent.  *Whren* v. *United States*, 517 U.S. 806, 813 (1996).

The record evidence provides the following undisputed facts.

**A.   *Factual Background***

<u>1.   The February 2018 Encounter with Law Enforcement in Phelps County, Missouri</u>

On February 22, 2018, Defendants, while driving a rented 2017 Ford Expedition with Kentucky license plates in Missouri, were pulled over by officers associated with the Phelps County Sheriff's Department, Officers Carmelo Crivello[2] and George Arnold.  Mr. Reyes Reyes was driving, his wife, Ms. Alvarez Manzanilla, was in the passenger seat, and his daughter and dog were in the backseat.  It was a foggy day and drizzling, but Mr. Reyes Reyes was driving without the use of his headlights.  That failure provided a reason for Officer Crivello to stop the car.

While conducting routine questioning, checking the rental contract, explaining the traffic violation, and running Defendants' licenses,[3] Officer Crivello asked about their trip itinerary.  At some point, after competing with the aggressively barking dog to be heard, Officer Crivello asked Mr. Reyes Reyes

---

[2] Officer Crivello was also associated with the United States Drug Enforcement Administration as a DEA Task Force Officer.
[3] Officer Crivello's suspicions were aroused when he found Mr. Reyes Reyes had a Texas license, but a residence in Arizona, and that Mr. Reyes Reyes provided a social security number assigned to another person.

to accompany him to his squad car, where he questioned him further.

Thereafter, Officer Crivello went back and forth between his squad car and the rental car as he talked with each Defendant individually.[4]  In the course of those conversations, it became apparent Defendants' stories did not align  regarding various aspects of their trip.  They both said they had come from Columbus, Ohio, but other basic details were inconsistent. For example, Mr. Reyes Reyes said they did not stay in a hotel, but Ms. Alvarez Manzanilla said they did so for one night.  Mr. Reyes Reyes said that his sister-in-law, who he could not name, lived in Ohio, but Ms. Alvarez Manzanilla said she did not have a sister who lived there.

As a result of the discrepancies, Officer Crivello asked further questions and at some point, Mr. Reyes Reyes agreed to allow him to search the car.[5]   Officer Crivello asked Defendants to follow him to the Sheriff's Department so that he could more fully conduct the search.  They did so, driving the rental car behind him to the station.

At the station, Defendants were placed in a waiting room or

---

[4] Although not directly addressed by either party, it appears the disruption caused by the barking dog ceased to be a problem once Mr. Reyes Reyes left the vehicle he had been driving.

[5] There is disagreement regarding whether Officer Crivello asked or if Mr. Reyes Reyes offered. In any event, Mr. Reyes Reyes did not object to the search of the automobile.

cafeteria, where they sat with one or two other officers while the car was searched.  Officers found large sums of U.S. currency, and Officer Crivello confronted Mr. Reyes Reyes with their discovery, asking him to "be honest."  Mr. Reyes Reyes put his head down on the table and said he would show Officer Crivello where the rest of the money was hidden, which he then did.  A total of $45,600 was recovered and a K-9 reacted positively to presence of narcotics associated with the money. In addition, two phones were found.  After a search of the phones, to which Mr. Reyes Reyes consented, Officer Crivello found there were only two numbers on the instruments.  Ms. Alvarez Manzanilla and Mr. Reyes Reyes confirmed that their stories about the trip to Ohio had been false and that the true purpose had been to transport the currency.  Ms. Alvarez Manzanilla, however, stated only that she understood the purpose of the trip to be picking "something" up in Ohio, which she may not have known was currency.  Mr. Reyes Reyes, on the other hand, explained all of the details regarding the currency pick-up to Officer Crivello and said he suspected the money came from illegal narcotics.  Defendants were not arrested, and they were permitted to leave at the conclusion of this search and the associated questioning.  The currency was seized.

### 2.   The March 2018 Search and Seizure in Carson County, Texas

Approximately one month later, a "Cynthia Alvarez"[6] signed a bill of lading to transport a 2012 Honda Accord that Mr. Reyes Reyes co-owned (with a third party, Nereyda Diaz Gutierrez, not either Ms. "Alvarez," or Ms. Alvarez Manzanilla) on a car carrier to be transported from their home in Arizona to Andover, MA, where a person named "Arnulfo" (Mr. Reyes Reyes's first name) was to pick it up.  While Mr. Reyes Reyes was present, Ms. "Alvarez" signed the bill of lading.  The driver, Leonard Juravlea, was given the keys; he was permitted by the contract of carriage to drive the car on and off the carrier and turn off the alarm if it sounded.

Observing the carrier en route in Carson County, Texas, Trooper Robert Bowden noticed that its trailer had an obscured license plate.  This observation led Trooper Bowden to stop the carrier.  He inspected the carrier-driver's license and registration, as well as the bills of lading for the cars on the carrier.  He asked about various cars on the carrier, including the 2012 Honda Accord.  The Honda Accord initially caught his attention, he said, because it had recently been cleaned.  He

---

[6] As the Indictment caption indicates, Defendant Alavarez Manzanilla is identified as "Cynthia Alvarez Manzanilla" and Defendant, Ms. Alvarez Manzanilla, has filed an affidavit asserting she signed the bill of lading in the name "Cynthia Alvarez" while her husband was present.

inquired further of Mr. Juravlea about the circumstances of the transport and the people involved.

Trooper Bowden's suspicions grew after running the license for Mr. Reyes Reyes when he discovered he had been stopped in a rental car in Carson County a month earlier.[7]  That, along with what he understood to be a known drug route between Phoenix, Arizona and Andover, Massachusetts (as a suburb of Boston),[8] a hotel as the delivery location, the recent cleaning of the car, and the fact that the car had been recently bought and paid for without a lien, caused Trooper Bowden to suspect criminal activity.

Trooper Bowden requested permission from Mr. Juravlea to search the car, and Mr. Juravlea agreed.  Once he began searching, Trooper Bowden noticed a raised floorboard and seat

---

[7] The February 23, 2018 Carson County stop was apparently the day after the February 22, 2018 stop and seizure in Phelps County, Missouri.  There is, however, no indication Trooper Bowden was aware of Defendants' Phelps County encounter when assessing whether the car on the carrier was suspicious.

[8] Trooper Bowden expressed the view in his report (Dkt. No. 97-3 at 3] that the pickup was to be in "Andover (suburb of Boston)" and thereafter identified the journey as "going from a major narcotic hub (Phoenix) and going to a major narcotic hub (Andover)."  It may strike a judicial officer in the District of Massachusetts as somewhat jarring to describe Andover as a major narcotic hub.  But from the perspective of a police officer in Carson County, Texas, destinations among outlining suburbs of Boston (like Andover) in close proximity to Essex County cities (like Lawrence, Methuen and Haverhill) widely recognized by Massachusetts judicial officers to have significant drug activity, appears somewhat understandable overbreadth in the description of a narcotic hub.

bolts that had been tampered with.  This turned out, upon
inspection, to be a false floor in the right rear passenger
side.  Thereafter, Trooper Bowden asked Mr. Juravlea to bring
the car to a police station in Panhandle, Texas; Mr. Juravlea
complied.  Upon a further search at the station, police found
approximately five kilograms of what turned out to be fentanyl
wrapped in cellophane in the hidden compartment.

DEA agents were notified, and they came to remove the
drugs.  They replaced the drugs with a package resembling
narcotics and let the car continue on its way, by carrier, so
they could observe who picked it up.  After the car was
delivered in Methuen, Massachusetts, DEA agents surveilled Mr.
Reyes Reyes and Ms. Alvarez Manzanilla.  The next day, they
stopped Defendants and received Mr. Reyes Reyes's consent to
search the car.  The false narcotics package was not found in
the hidden compartment, but two screwdrivers capable of opening
the false floor were discovered in Ms. Alvarez Manzanilla's
purse.

## II
### STOP OF RENTAL CAR IN PHELPS COUNTY, MISSOURI

### A. *Legality of the Stop*

As a general rule, "the decision to stop an automobile is
reasonable where the police have probable cause to believe that
a traffic violation has occurred. *Whren* v. *United States*, 516

U.S. 806, 810 (1996).  Whether or not the traffic violation is
the actual motive for the stop is not material when making a
threshold determination as to its validity.  *Id.* (citing *United
States* v. *Robinson*, 414 U.S. 218, 221 n.1 (1974)) (internal
quotations omitted) ("a traffic-violation arrest . . . would not
be rendered invalid by the fact that it was a mere pretext for a
narcotics search . . .").  Rather than analysis of a given
officer's  motivations, the proper inquiry concerns the
objective reasonableness of the stop.

Here, Mr. Reyes Reyes was driving the rented 2017 Ford
Expedition in foggy, drizzly weather without the use of his
headlights.  I do not understand any of the parties to suggest
that Officer Crivello's decision to pull the car over under
these circumstances was objectively unreasonable.

**B.  *Duration and Scope of the Stop and Associated Inquiries***

When a car is pulled over by law enforcement, everyone in
the car is seized, thereby implicating all their rights under
the Fourth Amendment to be free from unreasonable search and
seizure.  *Brendlin* v. *California*, 551 U.S. 249, 255 (2007).
However, such traffic stops are akin to "the kind of brief
detention authorized in *Terry* [v. *Ohio*, 392 U.S. 1 (1968)]." *Id.*
This kind of "temporary seizure of driver and passengers
ordinarily continues, and remains reasonable, for the duration
of the stop." *Arizona* v. *Johnson*, 555 U.S. 323, 333 (2009).  Law

enforcement inquiries that ask about "matters unrelated to the
justification for the stop [ ] do not convert the encounter into
something other than a lawful seizure, *so long as those*
*inquiries do not measurably extend the duration of the stop*."
*Id.* (citing *Muehler* v. *Mena*, 544 U.S. 93, 100-01 (2005))
(emphasis added).  Accordingly, the question at the heart of
Defendants' motions regarding the stop of their rental vehicle
is whether Officer Crivello's further questions regarding their
trip measurably extended the stop in an unreasonable fashion.

At this stage, "any action undertaken for the stop must be
reasonably related in scope to the stop itself unless the police
have a basis for expanding their investigation." *United States*
v. *Dion*, 859 F.3d 114, 124 (1st Cir. 2017) (internal citations
and quotations omitted).

Traffic stops often present evolving circumstances.  What
is or is not reasonable at a given moment during that evolution
depends on "how events unfold" in what the First Circuit has
referred to as the "emerging tableau" that develops in most
*Terry* stops.  *Dion*, 859 F.3d at 125.  The information the
officer possesses at each successive moment directly informs the
reasonableness of his subsequent actions.  *Id.* (citing *Terry*,
392 U.S. at 10) ("the police are in need of an escalating set of
flexible responses graduated in relation to the amount of
information they possess") (internal quotation marks omitted).

Reasonableness inquiries are based on "the totality of the circumstances," which "requires a practical, commonsense determination," grounded in "a measurable degree of deference to the perceptions of experienced law enforcement officers." *Id.* at 124.  It also must account for the "idiosyncrasies of the case at hand." *United States* v. *Chhien*, 266 F.3d 1, 9 (1st Cir. 2001).

In a routine traffic stop, officers are permitted to "request identification from the driver and to inquire into the driver's itinerary." *Dion* 859 F.3d at 125. (citing *United States* v. *Fernandez*, 600 F.3d 56, 60-62 (1st Cir. 2010) *and Chhien*, 226 F.3d at 6).  When a defendant's responses to such inquiries are unusual or implausible, it is reasonable for the officer to extend the search to investigate further. *See, e.g.*, *id.* at 126 (observing as "odd" the asserted purpose of trip and that the defendant had an Arizona license but Colorado license plates); *United States* v. *Ramdihall*, 859 F.3d 80, 88-89 (1st Cir. 2017) (observing the defendants' inability "to give plausible or consistent explanations during the initial encounter" and "some of them couldn't name the stores in which they shopped or where they were located"); *United States* v. *Chaney*, 584 F.3d 20, 26 (1st Cir. 2009) (observing the defendant's "implausible answers and nervous demeanor").

In *Dion*, *Ramdihall*, and *Chaney*, the defendants provided answers to officers' routine questions that were implausible, and this gave rise to reasonable suspicion that supported extending the focus and duration of the stops. *See generally*, *Chhien*, 266 F.3d at 6 (an officer "may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention"); *Unites States* v. *Sowers*, 136 F.3d 24, 27 (1st Cir. 1998) ("Such a shift in focus is neither unusual nor impermissible.")

Here, in the normal course of a traffic stop, Officer Crivello ran Mr. Reyes Reyes's Texas driver's license and found he had a residence in Arizona and presented a social security number assigned to another person.  He also asked Mr. Reyes Reyes and Ms. Alvarez Manzanilla in turn about their trip to Ohio.  Such questions are part of an ordinary stop and would not constitute an impermissible extension in their own right.  Almost immediately, inconsistencies arose about basic aspects of their trip, including where they stayed and which members of Ms. Alvarez Manzanilla's family were there.  In other words, it did not take long for apparent evasiveness to surface and materially change the Officer's evaluation of the situation as to which he was making inquiry.

Indeed, it became clear to Officer Crivello that there was something else going on based on Defendants' inability to

13

provide consistency regarding basic aspects of their trip. While it may ordinarily take more than implausible answers to routine questions by police to rise to the level of reasonable suspicion, common sense plays an integral role in this analysis and Defendants' comments were more than implausible. *See Kansas* v. *Glover*, 140 S. Ct. 1183, 1188 (2020) (internal citations, quotations, and emphasis omitted) (the reasonable suspicion "standard depends on the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act . . . . Rather, [courts] must permit officers to make commonsense judgments and inferences about human behavior."). Here, Officer Crivello could reasonably conclude at least one Defendant was necessarily lying about what should have been easily remembered facts about their trip.

Thus, to the extent that Officer Crivello extended the stop to pursue their stories further, he did so with the requisite reasonable suspicion. I will note, however, that it is not clear to me that the duration of the alleged extension was very long at all. Even by Defendants' own accounts, the questions began while the Officer was conducting portions of the stop that they do not suggest were improper. In any event, whether or not there was any material extension of the stop, neither Mr. Reyes Reyes's nor Ms. Alvarez Manzanilla's Fourth Amendment rights were violated by the questions Officer Crivello asked on the

14

side of the road.  Nor did either Defendant object at the time
to Officer Crivello's inquiries.

## C.   *Consent to Search the Vehicle*

In the absence of a separate justification, a search
without a warrant is unreasonable under the Fourth Amendment;
however, there are certain exceptions to the warrant
requirement, including the consent of the person whose property
is to be searched.  *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219
(1973) ("It is . . . well settled that one of the specifically
established exceptions to the requirements of both a warrant and
probable cause is a search that is conducted pursuant to
consent.").  Mr. Reyes Reyes argues that the consent he provided
in response to Officer Crivello's initial attempts to search the
rental vehicle were not voluntary.

As with the analysis of an extended traffic stop, "the
validity of a defendant's consent must be gauged under the
totality of the circumstances."  *United States v. Coombs*, 857
F.3d 439, 448 (1st Cir. 2017) (citing *United States* v.
*Stierhoff*, 549 F.3 19, 23 (1st Cir. 2008)).  This entails a
query as to "evidence of coercion, duress, confusion and the
like."  *Id.* (citing *Schneckloth*, 412 U.S. at 227).  Valid
consent must be free from the taint stemming from prior
illegality.  *United States* v. *Smith*, 919 F.3d 1, 10-11 (1st Cir.
2019).  Because I have found that the stop preceding the

consented-to search was legal, this issue is moot, leaving only the question of voluntariness of the consent itself.

To succeed on the merits of a motion to suppress evidence based on the proposition that consent was given involuntarily, a defendant must allege more than the fact of his seizure.  "[T]he fact of custody alone has never been enough in itself to [] demonstrate coerced . . . consent . . . ."  *United States* v. *Watson*, 423 U.S. 411, 424 (1976).  Rather, when the "permission to search was obtained by coercive means or under inherently coercive circumstances," the consent is involuntary.  *United States* v. *Forbes*, 181 F.3d 1, 5 (1st Cir. 1999).  "[T]he voluntariness issue turns, however, not on whether [defendant] was detained, but on whether he was detained in a manner that precluded him from freely consenting to the search."  *Ramdihall*, 859 F.3d at 89.

Without some showing of threat of physical force or intimidation, it is a high bar otherwise to prove the existence of an unduly coercive environment in which a defendant consents to a search.  *Id.* (voluntary consent found where there was "never any physical constraint, no handcuffing, no display of drawn weapons; the character of the interrogation was mild.");  *cf*. *Watson*, 423 U.S. at 424 ("no overt act or threat of force . . . no promises made to [the defendant], and no indication of more subtle forms of coercion that might flaw his judgment

16

. . . [even though] he had been arrested and was in custody."). Of course, evidence that the defendant was told of his rights to withhold consent counsels against a finding of involuntariness; nevertheless, this is but one "factor, [that] does not have controlling significance," especially when there is no indication in the record the defendant was a "newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice." *Watson*, 423 U.S. at 424-25.

Here, Mr. Reyes Reyes had been subject to some questioning on the side of the road; however, he does not contend he had been arrested or put into custody at that point.  Moreover, he makes no allegations as to any threats of violence, use of force, promises or representations made or otherwise inherently or outwardly coercive conduct on the part of Officer Crivello or his partner on the scene.  Rather, he rests solely on the fact that he was not advised of his right to decline to give consent and that he had been questioned.  This falls far short of what would be required to establish circumstances that deprived him of his ability to exercise free choice in allowing Officer Crivello's initial search of the rental car.  Similarly, Ms. Alvarez Manzanilla while contending she did not expressly consent to any search, also did not make any objection and acquiesced.  Officer Crivello's actions during the traffic stop did not violate Defendants' Fourth Amendment rights.

17

**III**
**QUESTIONING AND SEARCH OF RENTAL CAR**
**AT PHELPS COUNTY SHERIFF'S DEPARTMENT**

**A.    *Consent***

I understand both Defendants to contend that their consent
to bring the rental car to the Phelps County Sheriff's
Department for a further search was somehow not freely given.
However, the conditions under which Mr. Reyes Reyes provided
this consent were the same as those discussed above with respect
to the initial roadside search.  Accordingly, I find the consent
to bring the rental car to the Sheriff's Department was also
freely given and will not serve as the basis to exclude the
fruits of the search.

**B.    *Custodial Interrogation***

Defendants contend that they were subject to custodial
interrogations at the Phelps County Sheriff's Department while
the rental car was being searched and that the officers failed
to advise them of their *Miranda* rights in violation of the Fifth
Amendment protection against self-incrimination.

Statements obtained as a result of "custodial
interrogation" are inadmissible unless the government
"demonstrates the use of procedural safeguards effective to
secure the privilege against self-incrimination."  *Miranda* v.
*Arizona*, 384 U.S. 436, 444 (1966).  *Miranda* warnings are,

therefore, required when a defendant is (1) in custody *and* (2) subject to interrogation.

Addressing these requirements in reverse order, I observe first that an interrogation occurs when there is express questioning (or its functional equivalent) "that the police should know [is] reasonably likely to elicit an incriminating response from the suspect." *Rhode Island* v. *Innis*, 446 U.S. 291, 300-01 (1980).  Here, Officer Crivello's team had uncovered some of the hidden currency in the rental car already when he asked Mr. Reyes Reyes to "be honest" about it.  The amount of currency that was hidden strongly suggested a criminal connection.  At this point Mr. Reyes Reyes told him where to find the remainder of the hidden currency and explained that the purpose of his trip to Ohio had been to pick it up.  It would be hard to argue, and the government does not, that this interaction was anything other than a police interrogation to which Mr. Reyes Reyes responded.  Accordingly, the question of evidentiary suppression turns on whether he was "in custody" at the time.

When conducting analysis pursuant to the rights outlined in *Miranda*, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes* v. *Fields*, 565 U.S. 499, 508-09 (2012).  Those circumstances arise when "a reasonable person [would] have felt he or she was not at liberty to terminate the

interrogation and leave." *Thompson* v. *Keohane*, 516 U.S. 99, 112 (1995).

The threshold "freedom of movement" inquiry requires objective analysis of "all of the circumstances surrounding the interrogation." *Stansbury* v. *California*, 511 U.S. 318, 322 (1994). However, even if a person's freedom of movement was impaired in some fashion, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Howe*, 565 U.S. at 509.

For purposes of the pending motion, I will accept Defendants' characterization of the situation insofar as their freedom of movement was curtailed based on the unavailability of their rental car while they were being interrogated.

The Supreme Court, however, has "'decline[d] to accord talismanic power' to the freedom-of-movement inquiry," *Howe*, 565 U.S. at 509 (quoting *Berkemer* v. *McCarthy*, 468 U.S. 420, 437 (1984)) because "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Id*. (internal quotation marks omitted) (quoting *Maryland* v. *Shatzer*, 559 U.S. 98, 112 (2010)). I must also look at other relevant factors present in the attendant circumstances of the interrogation, which include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and

20

the release of the interviewee at the end of the questioning.
*Id.*  It may also include the number of law enforcement officers
present and the character of the interrogation. *United States* v.
*Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) (citing cases where
the presence of three to five officers did not constitute
custody for *Miranda* requirements).

In this case, Defendants drove themselves to the police
station, which itself undermines the basic premise that I have
assumed *arguendo*, which is that their freedom of movement was
sufficiently restricted such that *Miranda* warnings may have been
warranted.  Once they were at the station, Defendants, their
daughter, and their dog were brought to some kind of break room
or cafeteria, where they remained (with access to snacks and
restrooms) during their time at the Sheriff's Department, except
when Mr. Reyes Reyes went with Officer Crivello to the car
itself.  The various accounts indicate that one or two officers
were in the room with the family at all times, but there was
apparently no display of authority to keep them there.

Looking to the relevant factors outlined by the Supreme
Court and the First Circuit, I do not find the circumstances
surrounding the interrogation to have been so inherently
coercive as to require *Miranda* warnings.  Defendants were never
subject to any physical restraints, nor were they brought to any
kind of interrogation room or even separated, as I read their

(albeit, bare) allegations.  Moreover, the Officer's request for Mr. Reyes Reyes to "be honest" when faced with the discovery of some of the currency in the car was all it took for him to break down and share where the rest of the money was and what the true nature was of his trip to Ohio.  That one or two officers were present does not transform the situation into one of formal custody.  Finally, Defendants were not held in custody even after the search and interrogation, despite their admissions, discovery of the burner phones that were found and consensually searched, and seizure of the $45,600 in U.S. currency recovered.[9] Rather, they were permitted to leave without further interference.  Accordingly, apart from interim individual freedom-of-movements limitations, none of the relevant factors suggest that Defendants were in custody here.

Having found Mr. Reyes Reyes and Ms. Alvarez Manzanilla were not in "custody" within the meaning of *Miranda* when they made their various statements to the officers at the Phelps County Sheriff's Department, I conclude any failure to advise them of their Fifth Amendment rights under *Miranda* cannot serve as the basis for suppression.

---

[9] The Phelps County Sheriff Department Incident Report (USAO_000085-88) indicates only seizure of the currency.

**IV**
**SEARCH OF 2012 HONDA ACCORD ON CAR CARRIER IN TEXAS**

**A.  *Standing***

Courts have routinely "declined to extend the benefits of the exclusionary rule to defendants whose personal Fourth Amendment rights have not been infringed upon . . . ." *United States* v. *Symonevich*, 688 F.3d 12, 20 (1st Cir. 2012).  As the co-owner of the car in question, Mr. Reyes Reyes necessarily has a pertinent claim regarding his reasonable expectation of privacy in that vehicle.  Plainly, however, his rights were not violated by the search, so Ms. Alvarez Manzanilla's claim, under circumstances in which she had no ownership interest in the car, must also fail.

**B.  *Reasonable Expectation of Privacy***

The Fourth Amendment guarantees a right to be free from unreasonable searches and seizures in places where people have an actual, subjective expectation of privacy in a thing or place and where society is prepared to accept such an expectation as objectively reasonable.  *Georgia* v. *Randolph*, 547 U.S. 103, 110 (2006) ("The constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations); *Kyllo* v. *United States*, 533 U.S. 27, 34 (2001).  In general, one's reasonable expectation of privacy in a vehicle is a diminished

23

one; but there is "[n]o bright-line rule [that] determines whether a person has a reasonable expectation of privacy" in a vehicle. *United States* v. *Almeida*, 748 F.3d 41, 47 (1st Cir. 2014).  Instead, there are a variety of factors the court must consider in addition to the subjective and objectively reasonable expectations of the person(s) challenging the search: ownership, possession, control, historical use, and ability to regulate access. *Id.* (citing *United States* v. *Aguirre*, 839 F.2d 854, 856-57 (1st Cir. 1988)).

While not all bailment situations necessarily result in the bailor's loss of his expectation of privacy, depending on circumstances, that can be the case.  *See*, *Frazier* v. *Cupp*, 394 U.S. 731, 740 (1969) (items seized based on consent of cousin who was given permission to use part of duffel bag searched not excluded because the defendant "in allowing [cousin who consented to search] to use the bag and in leaving it in his house, must be taken to have assumed the risk that [he] would allow someone else to look inside"); *see also*, *United States* v. *Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("[W]here a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents."); *cf. United States* v. *Rodriguez-Ramos*, 704 F.2d 17, 21 (1st Cir. 1983) ("expectation

24

of privacy [not necessarily] defeated by giving luggage to a traveling companion to carry," rather, an inquiry regarding "the circumstances [surrounding] the relationship between the traveling companions, the conditions of the bailment, or the precautions taken to maintain privacy" is warranted).  In *Rodriguez-Ramos*, the defendant challenged the search and seizure of contents of an envelope in a bag he had given to his traveling companion to carry.  The First Circuit found he had no reasonable expectation of privacy in those contents after the District Court found that the bag belonged to his traveling companion, his traveling companion was using it to carry some of her own belongings, and the envelope was unsealed.

Defendants suggest that cars being shipped across the country on third-party carriers are analogous to sealed containers sent in the mail.  I disagree.  Not only is a car placed on a carrier not sealed (it must be unlocked at least for the carrier-driver to drive it on and off the car carrier), but it also does not receive the same threshold expectation of privacy in and of itself.  *Cf. United States* v. *Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy . . .").

The First Circuit has not yet had an opportunity to analyze expectation of privacy in car carriers driven by third parties,

but the Seventh Circuit has done so on two occasions.  In *United States* v. *Covarrubias*, 847 F.3d 556 (7th Cir. 2017) (per curiam) and *United States* v. *Crowder*, 588 F.3d 929 (7th Cir. 2009), the Seventh Circuit found no reasonable expectation of privacy in cars placed on third-party carriers for transport.  *Covarrubias* is distinguishable insofar as the defendant did not own the car as to which he challenged the search, but the court in *Crowder* made clear that when "doors were left unlocked, the driver of the car carrier was given the keys, and [the defendant] knew that the driver would enter the [car] and drive it . . . no one could have a reasonable expectation of privacy in the contents of a vehicle under those circumstances." *Crowder*, 588 F.2d at 934-35 (also drawing distinction between cars transported on car carriers and "closed containers," in which "individuals do not surrender their expectations of privacy . . . when they send them by mail or common carrier").

I recognize *Crowder* has not received universal approval. *See United States* v. *Castellanos*, 716 F.3d 828, 837 n.3 (4th Cir. 2013) (Davis, J. dissenting) (finding the premise in *Crowder* "deeply flawed and wholly unpersuasive.  Not even the majority in this appeal accepts the Seventh Circuit's dubious reasoning; the majority does not even bother mentioning *Crowder*").  Nevertheless, for myself I find the Seventh Circuit

approach compelling.[10]  That the bill of lading in these cases
did not expressly authorize the drivers' consent to a search
does not give rise to expectations of privacy in the cars when
the circumstances make clear the driver has been given general
exercise of authority to permit access to the vehicle in
practice.

The relevant factors outlined by the Seventh Circuit,
particularly the defendants' relinquishing of keys, custody, and
control over the vehicles, as well as the express permission
given for the carrier-driver to drive the vehicle, are present
in this case.  Ceding this kind of control, granting third-party
access, and choosing alternate means of transportation to meet
the car at the destination each individually, and certainly
together, cut against finding a reasonable expectation of
privacy in a car being transported by a third party.

Considering, for purposes of analysis, the analogy to the
duffel bags in *Frazier* and *Rodriguez-Ramos*, I have concluded
that an automobile traveling across the country on a car
carrier, which can be unlocked and driven by the carrier-driver,
is more akin to a bag entrusted to and left with a third party

---

[10] Although the defendant in *Covarrubias* neither owned nor had
been in the car, the facts "mirror[ed] *Crowder* in legally
relevant ways: the car hauler received keys to a car being
shipped cross-country and permission to drive the car on and off
the trailer." *Covarrubias*, 847 F.3d 556, 558 (7th Cir. 2017).

27

who is also given permission to use part of the bag, than to a
bag that the owner personally accompanies during its travels.
Accordingly, I find that Mr. Reyes Reyes had a diminished
expectation of privacy in the car once he placed it on the
carrier and no reasonable expectation that the driver would not
disclose any contents to law enforcement personnel upon a stop.
Indeed, the bill of lading contained an express verification
that the "vehicle [was] free of contents."  This thereby
requires the same finding as to Ms. Alvarez Manzanilla's claim
of expectation of privacy.  Thus, Trooper Bowden's search of the
2012 Honda Accord did not violate either Defendant's Fourth
Amendment rights, and the drugs seized as fruits of this search
will not be excluded.

## C.   *Car Carrier Driver's Apparent Authority to Consent to Search by Law Enforcement*

Even if Mr. Reyes Reyes did have a reasonable expectation
of privacy in the Honda Accord, the warrantless search may still
be upheld based on Mr. Juravlea's consent to the search.  As
discussed more fully, *supra*, consent is a valid exception to the
warrant requirement for a search.  For the search of the Accord,
however, it was a third party, Mr. Juravlea, rather than Mr.
Reyes Reyes himself who consented to Trooper Bowden's search.

The question whether Trooper Bowden's reliance upon Mr.
Juravlea's consent to search the Honda accord was valid turns on

the reasonableness of his belief. *Illinois* v. *Rodriguez*, 497 U.S. 177, 185-86 (1990) (the standard for reliance on a consenting party's apparent authority "is not that they always be correct, but that they always be reasonable."). To make such a determination, I must ask "would the facts available to the officer at the time the consent is given warrant a person of reasonable caution in the belief that the consenting party had authority over the item to be searched?" *United States* v. *James*, 353 F.3d 606, 615 (8th Cir. 2003) (citing *Rodriguez*, 497 U.S. at 188) ("It cannot be reasonable to rely on a certain theory of apparent authority, when the police themselves know what the consenting party's *actual* authority is . . ."). The inquiry concerns what the officer, not the consenting party, knows at the time. *Id.*

When making this inquiry, the touchstone is not the law of property, "with its attendant historical and legal refinements, . . . [rather it rests] on mutual use of the property by persons generally having joint access *or control for most purposes* . . . and [further] that the others have assumed the risk that one of their number might permit the common area to be searched." *United States* v. *Matlock*, 415 U.S. 164, 171 n. 7 (1974) (emphasis added).

In *James*, the items in question were computer discs, which the officers knew the third party only had in order to destroy

them, and that the top disc on the pile inside the sealed envelope where they were stored said "confidential," "personal," "private." *James*, 353 F.3d at 615.  Given what was known to the officers who wanted to search the discs under those circumstances, the Eighth Circuit held the "detectives knew too much about [the defendant's] manifested desire to keep others, including [the third party who consented to the search] from seeing the contents of the disc to rely on [the third party's] authority to consent.  *Id.*

Thus, "mere possession of [a] container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents." *Basinski*, 226 F.3d at 834.  "Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched," which requires a fact specific inquiry to decide whether someone had actual or apparent authority to consent to a search. *United States* v. *Jackson*, 598 F.3d 340 (7th Cir. 2010) (quoting *Basinski*, 226 F.3d at 834).

One of the relevant factors in this inquiry is the effort undertaken by the defendant to establish "precautions [ ] to ensure privacy, such as locks or the government's knowledge of the defendant's orders not to open the container." *Basinski*, 226 F.3d at 835.  Part of this inquiry is whether the defendant

30

provided the third party with the means to open a container that otherwise locks. *Id.* (citing *United States* v. *Presler*, 610 F.3d 1206, 1214 (4th Cir. 1979)) ("With respect to locking mechanisms, courts also consider whether the defendant provided the third party with the combination or key to the lock").

Another factor is the nature of the container itself.  As the Seventh Circuit observed in *Basinski*, "it is less reasonable for a police officer to believe that a third party has full access to a defendant's purse or briefcase than, say, an open crate." 226 F.3d at 834; *See also, United States* v. *Andrus,* 483 F.3d 711, 717 (10th Cir. 2007) (citing *United States* v. *Block*, 590 F.2d 535, 541 (4th Cir. 1978)) ("Objects typically associated with high expectations of privacy include mankind's valises, suitcases, footlockers, [and] strong boxes"); *United States* v. *Salinas-Cano*, 959 F.2d 861, 865 (10th Cir. 1992) (contrasting a suitcase, which gives rise to a high expectation of privacy, with a cardboard box, cassette tape, or plastic bucket, which create lesser expectations of privacy).

Similarly, when there is a custom of relinquishing authority over the item searched in a given set of circumstances, the belief that the person to whom that authority was granted can provide valid consent to the warrantless search is more reasonable. *See United States* v. *Moran*, 944 F.3d 1, 9 (1st Cir. 2019) (discussing *United States* v. *Jenkins*, 92 F.3d

430, 437-38 (6th Cir. 1996), which held that a truck driver had
apparent authority to consent to a search of the trailer, even
after disclaiming ownership, due to the "custom specific to the
trucking industry" in which "the generic relationship between
the owner of a rig and its driver is characterized by a
considerable grant of authority to the driver, as the driver is
typically allowed to enter the trailer… [during] loading,
unloading, [for] an inspection after an ominous noise, or [for]
an emergency.").

Here, Trooper Bowden could take into consideration much
more than Mr. Juravlea's 'mere possession' of the Honda Accord
when relying on his consent to the search.  First, Defendants
took no precautions to lock the car (or, 'seal the container')
before sending it on its cross-country journey.  It was the
driver, not Defendants, who maintained both custody and control
over the vehicle for the thousands of miles it needed to travel
to the final destination.  Second, the automobile was much more
akin to an open crate than a purse or briefcase for purposes of
answering whether or not it was reasonable for an officer to
believe that a third party had the authority to consent to the
search.  Indeed, from Trooper Bowden's perspective, Defendants
had relinquished all control over an item typically associated
with a lower expectation of privacy, to Mr. Juravlea.  Third,
Defendants made no efforts to restrict Mr. Juravlea's access;

instead, they gave him keys so that he could lock or unlock the vehicle subject to his own discretion and the needs of any emergent situation.  These factors, of which Trooper Bowden was aware when he made his request to search the Honda Accord, cut strongly in favor of Mr. Juravlea's apparent authority to give the consent that he did, in fact, provide. *Accord*, *Crowder*, 588 F.3d at 936 ("A reasonable person would conclude, based on the amount of control over the [car] that the driver of the carrier exercised, that the driver had authority to consent to the police search of the car."). Accordingly, Trooper Bowden's reliance on Mr. Juravlea's consent to his warrantless search of Mr. Reyes Reyes's car was objectively reasonable and, therefore, not grounds for suppression of the evidence the trooper found inside the car.

V

**CONCLUSION**

For the reasons described, I hereby DENY Defendants' separate motions [Dkt Nos. 87, 89, 93, 94] to suppress evidence.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE